UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS A. MONTGOMERY & BETH
W. MONTGOMERY,

    Plaintiffs,

    v.

INTERNAL REVENUE SERVICE,

    Defendant.

Civil Action No. 17-918 (JEB)

**MEMORANDUM OPINION**

    This Opinion marks the Court's latest foray into the dense thicket that is this Freedom of Information Act litigation between Plaintiffs Thomas and Beth Montgomery and Defendant Internal Revenue Service. Over the course of three and a half years, six Opinions, and two substantive Orders, the parties have tangled over the agency's search for records relating to its investigation into a multi-billion-dollar tax-shelter scheme involving Plaintiffs. It seemed, following the Court's most recent merits dive earlier this year, that the items remaining in dispute had been pruned back to a mere few, and that a path out of the wood could be discerned. Alas, after reviewing the parties' latest round of summary-judgment briefing, the Court finds that a single patch of brambles remains. Although it is largely satisfied with the sum total of Defendant's various searches, the Court concludes that Plaintiffs have raised one relatively minor area of insufficiency. It will therefore grant in part and deny in part the parties' Cross-Motions for Summary Judgment and direct the IRS to renew its search as specified below.

1

**I.      Background**

As the Court has set forth the facts surrounding this long-winding litigation on numerous occasions, see, e.g., Montgomery v. IRS, No. 17-918, 2020 WL 1451597, at *1–3 (D.D.C. Mar. 25, 2020), it confines its scene-setting to those particularly relevant to the present Motions. Seeking to unearth who blew the whistle on their tax-shelter scheme, the Montgomerys submitted a FOIA request for twelve types of records to Defendant. Id. at *2. Requests 1-5 sought various IRS forms used in connection with a confidential informant; Requests 6-12 sought lists, documents, or correspondence between the agency and any third party regarding Plaintiffs' potential tax liability or partnership transactions. See ECF No. 1 (Complaint), ¶ 16. Displeased with the agency's response (which provided them no documents), id., Exh. E (8/18/16 Ltr.) at 2, the Montgomerys filed this action on May 16, 2017.

Several rounds of summary-judgment motions ensued. The IRS eventually tendered a so-called Glomar response — refusing to confirm or deny the existence of any responsive records — as to Requests 1-5. Montgomery, 2020 WL 1451597, at *2. The Court agreed that the agency's Glomar response was appropriate, finding that disclosure of the existence (or non-existence) of responsive records was reasonably likely to compromise the Service's efforts to protect the identities of confidential sources. Montgomery v. IRS, 330 F. Supp. 3d 161, 170–71 (D.D.C. 2018).

Litigation surrounding Requests 6-12 followed a more tortuous path. Although Defendant at first stood on its initial search, the Court deemed that effort inadequate. Id. at 172. The IRS soon conducted a renewed search, after which it provided Plaintiffs 1,035 pages of responsive records from a broader collection of documents the parties refer to as the Bemont and Southgate litigation files. Montgomery, 2020 WL 1451597, at *2. After additional briefing

2

surrounding the adequacy of its search with respect to other repositories, the agency once again invoked Glomar — but this time only for records responsive to Requests 6-12 that were also responsive to Requests 1-5. Id. at *3. In other words, "to the extent that there might be overlap between documents concerning a confidential informant (Requests 1-5) and documents concerning the agency and a third party regarding Plaintiffs (Requests 6-12), the [IRS] offered a Glomar response, while stating that there were no responsive documents to Requests 6-12 not within [its] Glomar response." Id. at *6 (emphasis added) (internal quotations marks and citation omitted). Following review of the agency's briefing and its *in camera* declaration, this Court last March deemed its submissions regarding Requests 6-12 sufficient to justify its invocation of Glomar. Id.

That issue aside, the Court nevertheless found that the agency's search was still inadequate with respect to Requests 6-12. Id. at *5. In addition to "fail[ing] to provide an 'assertion that [it had] searched all locations likely to contain responsive documents,'" Defendant declined entirely to search a repository — the Office of Tax Shelter Analysis (OTSA) — "that would seem to be a natural location for responsive documents." Id. at *5 (quoting Bartko v. DOJ, 167 F. Supp. 3d 55, 64 (D.D.C. 2016)) (emphasis removed). In light of those shortcomings — which left "'substantial doubt' as to the adequacy of [the IRS's] search" — the Court directed the agency "to either renew its search or provide additional affidavits in accordance with [the Court's] Opinion." Id. (quoting Beltranena v. Clinton, 770 F. Supp. 2d 175, 183 (D.D.C. 2011)).

Approximately three months thereafter, the Service informed the Court that it had now "completed its renewed search of OTSA, and certain other potential record repositories." ECF No. 99 (6/30/20 Joint Status Rep.) at 2. It subsequently filed a declaration to that effect from Amy Mielke, an attorney in the IRS's Office of Chief Counsel, who asserted that the agency had

3

"searched all locations/systems reasonably likely to contain records responsive to [Requests] 6-12." ECF No. 102-1 (Second Supplemental Declaration of Amy Mielke), ¶¶ 1, 8. Dissatisfied with the IRS's latest effort, Plaintiffs recently moved for summary judgment on the alleged inadequacy of its latest search. See ECF No. 104-1 (Pl. MSJ) at 2. Defendant having opposed and cross-moved — with another Mielke declaration in tow — the Court is now ready to rule. See ECF Nos. 106-1 (Def. Cross-Mot. & Opp.), 106-2 (Third Supplemental Declaration of Amy Mielke).

## II.     Legal Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). "In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party." Coss v. DOJ, 133 F. Supp. 3d 1, 3 (D.D.C. 2015) (citing Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006)).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Off. of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In these cases, the agency bears the ultimate burden of proof to demonstrate the adequacy of its search and that it properly withheld any records. See Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 88, 91 (D.D.C. 2009); see also Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007). The Court may grant summary judgment based solely on information provided in an agency's affidavits or

declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted).

### III. Analysis

As in most iterations of this litigation, the primary dispute here revolves around the adequacy of the Government's search. The Court will examine that issue after first dispatching a brief preliminary matter.

#### A. Stating Results of Search

Plaintiffs devote a considerable portion of their opening brief to arguing with their customary vituperation that the IRS improperly failed to state publicly the results of its search for records that are responsive only to Requests 6-12. See Pl. MSJ at 5–10. That is, although they recognize the Court's determination that the agency may invoke Glomar for "overlapping" records responsive to both Requests 6-12 and 1-5, they contend that Defendant must publicly acknowledge whether its search yielded records responsive solely to Requests 6-12, given that it nowhere claims such "non-overlapping" records are covered by Glomar. Id. at 7–8; see also id. at 10 ("Defendant must publicly state the results of its search for records over which it does not assert Glomar in a sworn declaration."); Def. Cross-Mot. & Opp. at 3 n.1 (invoking Glomar only "to the extent that Requests 6-12 overlap with Requests 1-5") (citation omitted). An agency,

after all, may not refuse to confirm or deny the existence of responsive documents to which Glomar does not apply. Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

The IRS, however, has remedied this shortcoming, submitting along with its Cross-Motion precisely what Plaintiffs insisted was lacking: a public declaration that "[t]here are no additional 'non-overlapping' records responsive to [Requests] 6-12, but not responsive to [Requests] 1-5, to release to Plaintiffs as a result of the IRS' renewed search." Mielke 3d Suppl. Decl., ¶ 8; see also id., ¶ 7 (stating that agency "has released all 'non-overlapping' responsive non-exempt records located in its renewed search"); Def. Cross-Mot. & Opp. at 13. Defendant, therefore, has now "publicly state[d] the results of its search for records over which it does not assert Glomar." Pl. MSJ at 10 (emphasis removed). Indeed, Plaintiffs themselves recognize as much. See ECF No. 107 (Pl. Reply & Opp.) at 12–13 (acknowledging that "Defendant has finally submitted a public declaration that states whether Defendant has located . . . records" responsive only to Requests 6-12) (citing Mielke 3d Suppl. Decl., ¶ 8).

With this issue in the rearview mirror, the Court now turns to the adequacy of Defendant's search for records responsive solely to Requests 6-12.

B. Adequacy of Search

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)). "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." Weisberg v. DOJ, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The adequacy of an agency's search for documents requested under FOIA "is judged by a

standard of reasonableness and depends, not surprisingly, upon the facts of each case." Id.  To meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). Absent contrary evidence, such affidavits or declarations are generally sufficient to show that an agency complied with FOIA. Id.  "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

To demonstrate the adequacy of its search here, the IRS relies on an array of declarations submitted over the course of this litigation. See Def. Cross-Mot. & Opp. at 7–11.  These sworn statements — the most recent of which are Amy Mielke's second and third supplemental declarations — detail its renewed investigation performed in the aftermath of the Court's March 25, 2020, Opinion, as well as prior searches for records potentially responsive to Requests 6-12. See Mielke 2d Suppl. Decl., ¶¶ 7–54.  Defendant's efforts, considered in their entirety, have ranged far and wide.  In brief, it ran queries through its Integrated Data Retrieval System and searched taxpayer master files using Plaintiffs' names and those of associated tax shelters. Id., ¶¶ 40, 42–44.  It combed through information systems within the Large Business and International Division and, more recently, the Whistleblower Office. Id., ¶¶ 31–35, 49–50; ECF No. 71-1 (Declaration of Joseph Hebb), ¶¶ 26–43.  It likewise examined legal and administrative files relating to the Bemont and Southgate cases, as well as the records of several individuals who provided assistance during the latter litigation. See Mielke 2d Suppl. Decl., ¶¶ 31–34, 51–54; ECF No. 81-2 (Declaration of Amy Mielke), ¶¶ 21–60.  On several occasions in mid-2020, moreover, Mielke contacted employees across the agency in order to confirm that particular

7

searches performed years earlier were in fact the techniques best suited to yield responsive documents. See Mielke 2d Suppl. Decl., ¶¶ 10, 47.

The IRS has also addressed two discrete issues identified in this Court's March Opinion. First, although it declined to do so previously, the agency has now searched OTSA for records potentially responsive to Requests 6-12. Id., ¶¶ 12–22; Mielke 3d Suppl. Decl., ¶¶ 13–31. Specifically, it investigated three electronic databases containing various tax records — including reportable-transaction disclosures, tax-shelter-registration applications, and material-advisor-disclosure statements — using as keywords Thomas and Beth Montgomery's names and social-security numbers, along with the names and tax-identification numbers of four associated entities. See Mielke 2d Suppl. Decl., ¶¶ 16, 18. It also searched OTSA's paper records for potentially responsive material-advisor lists. See Mielke 3d Suppl. Decl., ¶ 29. Second, the agency has now recited the magic words that were conspicuously absent throughout its last summary-judgment bid — namely, that "it has searched all locations/systems reasonably likely to contain records responsive to [Requests] 6-12." Mielke 2d Suppl. Decl., ¶ 8; see also Mielke 3d Suppl. Decl., ¶ 10. That assertion, or something akin to it, is a critical prerequisite to any determination that the IRS performed an adequate search. See Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).

Plaintiffs, unsurprisingly, remain unmoved by these efforts. Although they do not take issue with the vast majority of Defendant's searches for records responsive to Requests 6-12, they highlight four discrete areas in which the agency's investigation was allegedly inadequate. The Court will take each in turn, finding for the IRS on all but the last.

1. *Office of Tax Shelter Analysis*

In its latest merits Opinion, this Court faulted the IRS for insufficiently supporting its decision not to search OTSA, a repository that bore the potential to contain responsive records. Montgomery, 2020 WL 1451597, at *5. As explained above, the agency has now performed the very search it initially declined to undertake, having explored multiple OTSA databases containing different categories of tax records. See Mielke 2d Suppl. Decl., ¶¶ 16–18; Mielke 3d Suppl. Decl., ¶ 13. According to Defendant, "[T]here are no additional OTSA files that could reasonably be searched to locate records responsive to [Requests] 6-12." Mielke 2d Suppl. Decl., ¶ 22.

Plaintiffs do not directly dispute that assertion. Instead, they take issue with statements in Mielke's Second Supplemental Declaration suggesting that the agency's search was confined to electronic files. Emphasizing that their FOIA request was not so limited, the Montgomerys insist that Defendant has not adequately demonstrated that its OTSA search "was reasonably calculated to uncover all relevant documents, not simply those in certain electronic files." Pl. MSJ at 13–14.

As an initial matter, the IRS has recently performed an OTSA search of Plaintiffs' desired non-electronic variety, combing through six boxes of paper records containing material-advisor lists from 2000 to 2007 (the span of the Montgomerys' request). See Mielke 3d Suppl. Decl., ¶ 29. The agency has not, therefore, "search[ed] only . . . electronic files" within OTSA. See Pl. MSJ at 13. In any event, in her most recent declaration, Mielke avers that neither she nor two other OTSA employees are "aware of any other OTSA electronic or paper records repository that would include records potentially responsive to any of [Requests] 6-12." Mielke 3d Suppl. Decl., ¶¶ 31–32 (emphasis added); see also id., ¶ 19 (explaining that OTSA retains no index or

9

catalog system organized by name, social-security number, or tax-identification number for paper records from 2000 to 2007). Plaintiffs offer no grounds to doubt that statement, which, as a reminder, is accorded a presumption of good faith. SafeCard Servs., 926 F.2d at 1200. Neither do they identify other OTSA archives Defendant should have investigated nor other queries it should have deployed. Indeed, perhaps recognizing the force of the agency's rebuttal, Plaintiffs do not even mention OTSA in their Reply brief. In the end, Defendant's efforts, combined with its public declarations and *in camera* submissions, are more than sufficient to establish that its OTSA search was "reasonably calculated to uncover all relevant documents." Valencia-Lucena, 180 F.3d at 325 (quoting Truitt, 897 F.2d at 542).

### 2. *Existing Documents*

The Montgomerys next argue that the agency's search was inadequate because it did not turn up certain documents responsive to Requests 6-12 that are "known to exist." Pl. MSJ at 14–18. Although they claim to be "aware of the existence of hundreds of" unproduced, responsive documents in Defendant's custody, Plaintiffs appear to identify only ten: five material-advisor lists "provided during the Bemont proceedings," a single document "related to IRS treaty requests to China," two "third-party summonses," and two single-paragraph documents withdrawing those summonses. Id. at 15; ECF No. 82 (9/17/19 Pl. Opp.), Exhs. A–G (attaching documents). They argue that the IRS's failure to locate these responsive documents is a "positive indication[] of overlooked materials," thus suggesting the general inadequacy of the agency's search. See Pl. MSJ at 15–17 (alteration in original) (quoting Montgomery, 2020 WL 1451597, at *5).

It is well established, however, that an "agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the

determination that [it] conducted an adequate search." Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004). "After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). For that reason, there is no requirement that a search must "actually uncover[] every document extant." SafeCard Servs., 926 F.2d at 1201; see also Mobley v. CIA, 806 F.3d 568, 583 (D.C. Cir. 2015) (explaining that search may be reasonable even if "it fails to produce all relevant material") (quoting Meeropol v. Meese, 790 F.2d 942, 952–53 (D.C. Cir. 1986)); Pl. MSJ at 17 (admitting same). On the contrary, courts in this district routinely reject charges that searches are inadequate simply because they do not locate certain specific records. See, e.g., Dean v. U.S. Dep't of Justice, 141 F. Supp. 3d 46, 49 (D.D.C. 2015); Gilliam v. U.S. Dep't of Justice, 236 F. Supp. 3d 259, 265 (D.D.C. 2017); Hall & Assoc. v. EPA, 83 F. Supp. 3d 92, 99–100 (D.D.C. 2015); Dutton v. U.S. Dep't of Justice, 302 F. Supp. 3d 109, 120 (D.D.C. 2018).

       The adequacy of a search, therefore, does not turn on "the fruits of the search," but rather on "the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315. Here, Plaintiffs offer no reason to believe that Defendant's search methodology was inadequate. They do not maintain, for instance, "that [it] failed to search particular offices or files where the document[s] might well have been found." Id. Nor do they argue that the agency ignored any indication that the identified records might be located elsewhere, or that it previously produced them in response to FOIA requests by other individuals. Id. In the absence of these or other red flags, the mere fact that the IRS uncovered less than the Montgomerys hoped does not render its search unreasonable. Plaintiffs' related contention — that the existence of additional responsive documents undermines the presumed good faith of the agency's search, see Pl. MSJ at 18; Pl.

11

Reply & Opp. at 6, 12 — founders for the same reason. See Fischer v. U.S. Dep't of Justice, 723 F. Supp. 2d 104, 109–10 (D.D.C. 2010) ("Even [a] plaintiff's showing of specific responsive documents that exist and were not produced does not rebut the presumption of good faith accorded to agency affidavits.") (citing Nation Mag. v. U.S. Customs Serv., 71 F.3d 885, 892 n.7 (D.C. Cir. 1995)).

Defendant, it merits adding, recently undertook additional measures aimed at uncovering certain of the documents Plaintiffs identified, thus further reinforcing the adequacy of its search. See Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 144 (D.D.C. 2015) (crediting government's additional search for documents plaintiff believed were missing from search results). With regard to the five material-advisor lists potentially responsive to Request 6, see 9/17/19 Pl. Opp., Exh. A at ECF pp. 6–10, Mielke personally reviewed the individual documents, provided them to OTSA, and requested that the office make "additional inquiries regarding whether [it] might have any material advisor lists responsive to [Request] 6, including the five particular lists provided by Plaintiffs." Mielke 3d Suppl. Decl., ¶¶ 27–28. As described above, OTSA staff then located and physically searched six boxes of material-advisor lists from 2000 through 2007, but did not find Plaintiffs' identified documents therein. Id., ¶ 29; Def. Cross-Mot. & Opp. at 9–10. As for the remaining files — including the treaty request and summonses, see 9/17/19 Pl. Opp., Exhs. C–G — there is no indication that they were in the IRS's possession upon their creation in 2006 and 2007, let alone that they were retained a decade later and should have been unearthed by any reasonable search. See ECF No. 85 (10/16/19 Def. Reply) at 11–12; Veterans for a Strong Am. v. Dep't of State, 211 F. Supp. 3d 182, 192–93 (D.D.C. 2016) ("To the extent that the records [the plaintiffs] seek are outside [the agency's] possession and control, [the agency] is not required to search for them.") (citing Kissinger v.

12

Reporters Comm. for Freedom of the Press, 445 U.S. 136, 151–52 (1980)); Wilbur, 355 F.3d at 678 ("[T]he fact that responsive documents once existed does not mean that they remain in the [agency's] custody today or that the [agency] had a duty under FOIA to retain the records.").

The existence by itself of documents Plaintiffs claim should have been returned by Defendant's search, accordingly, does not raise "substantial doubt" concerning its adequacy. Iturralde, 315 F.3d at 314 (quoting Valencia-Lucena, 180 F.3d at 326).

### 3. *Administrative Files*

The Montgomerys briefly maintain that "Defendant has not searched the IRS administrative file for the entity Bemont Investments, LLC or three boxes of Southgate-related administrative files." Pl. MSJ at 19. The Court, too, can dispense with this issue in short order. Contrary to Plaintiffs' insistence, the agency did search the Bemont Investments administrative file — which consisted of three folders of paper records — but found no documents responsive to Requests 6-12. See Mielke Decl., ¶¶ 31–33. To the extent the Montgomerys mean to reference the administrative file for BPB Investments, LLC — another entity involved in the Bemont litigation — those records were previously destroyed. Id., ¶ 33. That reality, however, does not preclude summary judgment in Defendant's favor; nor do Plaintiffs so argue. See Reporters Comm., 445 U.S. at 151–52 (explaining that FOIA requires agencies to disclose only records "for which they have chosen to retain possession or control"); SafeCard Servs., 926 F.2d at 1201; Callaway v. U.S. Dep't of Treasury, 893 F. Supp. 2d 269, 275 (D.D.C. 2012). With regard to the three allegedly unsearched boxes in the Southgate administrative file, as Defendant recounts, the Department of Justice in 2017 returned the 24-box file to the IRS, which eventually "consolidated" it into 21 boxes. See Mielke Decl., ¶¶ 35–44; Def. Cross-Mot. & Opp. at 16. Those files, notably, "had not been separated," and Defendant searched each of the 21 retained

boxes (a process that culminated in Plaintiffs' receiving 952 pages of documents).  See Mielke Decl., ¶¶ 38, 41–43.  According to Mielke, there is "no indication" that any additional Southgate administrative files exist, id., ¶ 44, and the Montgomerys have not offered any "countervailing evidence" suggesting otherwise.  Iturralde, 315 F.3d at 314 (citation omitted).

Plaintiffs also complain that the agency has not submitted a declaration with "direct personal knowledge" or "explain[ed] how Ms. Mielke would know that files were destroyed or consolidated."  Pl. MSJ at 19.  FOIA declarants, however, need not "have been personally involved in each of the challenged searches," but rather may "attest to [their] personal knowledge of the procedures used in handling [a FOIA] request and [their] familiarity with the documents in question."  Wisdom v. U.S. Tr. Program, 266 F. Supp. 3d 93, 102 (D.D.C. 2017) (second alteration in original) (citations omitted); see also Barnard v. Dep't of Homeland Sec., 531 F. Supp. 2d 131, 138–39 (D.D.C. 2008) (similar).  The relevant Mielke declaration — one of several reflecting her comprehensive understanding of the documents at issue, as well as her extensive collaboration with the experienced agency employees who searched them — easily satisfies these criteria.  See Mielke Decl., ¶¶ 11–18, 30–44.  Defendant likewise need not provide additional detail regarding the processes by which particular records were destroyed or consolidated; Mielke's recounting of the files' chain of custody and agency employees' handling thereof is sufficient as it stands.  Id., ¶¶ 30–33, 35–44; see also SafeCard Servs., 926 F.2d at 1201 (crediting affidavit of agency search coordinator who relied upon information provided by other employees); Perry, 684 F.2d at 127 (explaining that affidavit need not "set forth with meticulous documentation the details of an epic search for the requested records").  Plaintiffs, moreover, have once again done nothing to rebut the "presumption of good faith" accorded Mielke's declaration.  SafeCard Servs., 926 F.2d at 1200.  No more need be said here.

4. *Employee Emails*

With but a toe in the door, Plaintiffs offer one last argument to prevent its slamming shut. They contend that the IRS failed to justify its decision not to search the emails of certain agency employees involved in the Bemont and Southgate litigation who were likely to have documents responsive to Requests 6-12. See Pl. MSJ at 19–20; Pl. Reply & Opp. at 9–11. Specifically, they identify five individuals — Robert Gee, Sunny Chung, Ruth Levine, David Thurber, and Cheryl Kiger — who they claim were Defendant's Rule 30(b)(6) witnesses expected to "testify about information known or reasonably available to the [IRS]." Pl. Reply & Opp. at 9 (quoting Fed. R. Civ. P. 30(b)(6)); see also 9/17/19 Pl. Opp. at 10. Although the precise role these employees ultimately played in the litigation is less than clear, Plaintiffs maintain that they would have been familiar with any material-advisor lists and third-party communications regarding the Montgomerys — in other words, the precise documents at issue in Requests 6-12 — and that any reasonable search should have extended to their records. See Pl. Reply & Opp. at 9–10.

The Service's rejoinders on this point are thin at best. It first argues that Plaintiffs' true motive for pursuing the identified employees' records is their desire to obtain documents properly protected by Glomar. See Def. Cross-Mot. & Opp. at 18. While the agency may tender a Glomar response if appropriate, it has not yet formally done as to these records. In addition, the IRS points to its prior fruitless searches of the records of three other employees involved in the Southgate litigation. Id. (citing Mielke 2d Suppl. Decl., ¶¶ 32–34). As Mielke herself admits, however, those individuals had only "minimal involvement" and on matters unrelated to the litigation's primary issues. See Mielke 2d Suppl. Decl., ¶ 31. At any rate, Defendant "cannot limit its search to only one record system if there are others that are likely to turn up the

information requested." Oglesby, 920 F.2d at 68.  While the agency need not perform a search just because the Montgomerys suggest it, Mobley, 806 F.3d at 582, the Service cannot establish an adequate investigation simply by gesturing at past inquiries into peripheral employees' records when Plaintiffs identify other repositories seemingly more likely to contain relevant information.  See Wadelton v. Dep't of State, 106 F. Supp. 3d 139, 147 (D.D.C. 2015) (denying agency summary judgment where it searched emails of two employees and did not demonstrate that they "were the only individuals . . . likely to have emails or other" relevant documents).

As Defendant's explanation for declining to search the emails of the identified employees (or anyone else similarly situated) is thus unsatisfactory, it shall conduct such searches or offer a declaration better explaining why it need not do so.  Aside from this relatively minor exception, however, the Court is satisfied that the agency's search was adequate.

**IV.    Conclusion**

For the aforementioned reasons, the Court will grant in part and deny in part both Cross-Motions for Partial Summary Judgment.  A separate Order so stating will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  January 5, 2021